```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF GEORGIA
                     COLUMBUS DIVISION

PAUL JODY YANCEY,                *

     Plaintiff,                  *

vs.                              *
                                       CASE NO. 4:11-cv-34 (CDL)
BOARD  OF  REGENTS  OF  THE      *
UNIVERSITY SYSTEM OF GEORGIA,
et al.,                          *

     Defendants.                 *
```

O R D E R

Plaintiff Paul Jody Yancey ("Yancey"), who is proceeding pro se, was a student at the School of Nursing at Columbus State University ("CSU"). He alleges that the school and its instructors (1) discriminated against him on the basis of his disability when they required him to provide a letter from his doctor before continuing to participate in the clinical portion of a nursing course and (2) retaliated against him for opposing the alleged discrimination when they later failed him in that course and dismissed him from the school entirely. Yancey seeks monetary and equitable relief pursuant to the Americans with Disabilities Act of 1990 ("ADA") [as amended by the ADA Amendments Acts of 2008], 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794. The Court previously dismissed some of Yancey's claims,

and the following claims remain pending: (1) discrimination claims against Defendant Board of Regents of the University System of Georgia ("the Board") under Title II of the ADA and Section 504, and (2) retaliation claims against the Board and individual Defendants Dr. Sheri Noviello ("Noviello"), Dr. Elizabeth Frander ("Frander"), and Stephanie Lewis ("Lewis") under the ADA, 42 U.S.C. § 12203. *Yancey v. Davis*, No. 4:11-CV-34 (CDL), 2011 WL 3349834 (M.D. Ga. Aug. 3, 2011). Defendants seek summary judgment as to these remaining claims (ECF Nos. 54 & 63).

As explained below, the Court finds that Defendants did not unlawfully discriminate against Yancey when they required him to produce a letter from his doctor to show that his disability did not interfere with his ability to participate safely in the nursing program. The Court also finds that Yancey cannot establish his retaliation claim because his mistaken belief that requiring the letter was discriminatory was not objectively reasonable. Therefore, Defendants' motion for summary judgment is granted. In light of these rulings, Yancey's motion for partial summary judgment (ECF No. 53) is denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

2

Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Yancey, the record reveals the following.

Yancey has an abdominal hernia for which he has continuously received social security disability benefits since 2007. Yancey Dep. 13:22-14:7, ECF No. 56. He wears a prosthetic girdle to improve his ability to function. For purposes of the pending motions, Yancey has established that he has a legitimate disability.

Yancey became a student at the CSU School of Nursing in the Fall of 2010. *Id.* at 51:3-5. At that time, Noviello was the acting director of the school; Frander and Lewis were associate professors. Noviello Aff. ¶ 3, ECF No. 54-4; Frander Decl. ¶ 3, ECF No. 54-2; Lewis Decl. ¶ 3, ECF No. 54-3. Prior to enrolling in the nursing program, all students, including Yancey, were

3

required to submit a completed physical examination form. Noviello Aff. ¶ 4. Yancey's form stated that his abdomen was "abnormal" due to "hernia" with no further explanation. Lewis Dep. Ex. 2, Fall 2010 Student Physical Exam Form, ECF No. 57 at 149. According to Defendants, a typical hernia would not disqualify a student from participating in the nursing program as long as it did not restrict their ability to perform nursing tasks safely. Frander Decl. ¶¶ 4-6, 9. As it turned out, Yancey did not have a "typical" hernia, at least according to Defendants.

During one of his classes in his first semester, the students were required to perform a thoracic circulatory examination of their lab partner. This examination included placing a stethoscope directly on the student's skin, and as part of that examination, Yancey removed his prosthetic girdle, making his abdominal hernia visible. Frander entered the room during Yancey's examination and noticed what she considered to be unusual characteristics regarding Yancey's hernia. According to Frander, Yancey appeared to have nothing in between his intestines and his skin, which was so thin that Frander could see the contents of his intestines moving. *Id.* ¶¶ 5-6; Lewis Dep. Ex. 7, Photos of Abdomen, ECF No. 57 at 167-68. She had never seen a hernia like Yancey's.

4

Frander became concerned that Yancey's hernia might rupture when lifting a patient, resulting in injury to the patient and to Yancey. Frander Decl. ¶ 9. Although Yancey had already begun his classes and had participated in at least two clinicals, Frander and Lewis informed Yancey that he needed to provide a letter from his physician stating his lifting capacity and that his hernia did not create a safety hazard to himself or others in the nursing environment. Yancey Dep. 58:2-5. Yancey accused Frander and Lewis of discriminating against him because of his disability by requiring such a letter.

A couple of weeks later, Frander, Lewis, and Dr. Gail Jones, another nursing professor, met with Yancey to inquire why he had not submitted the required letter. *Id.* at 60:4-61:7. Their follow up regarding the letter surprised Yancey because he thought they would back off after he told them they were discriminating against him and because he had already attended three clinical classes at the nursing home. *Id.* at 60:14-19. Yancey informed them that he had lifted a patient twice during those clinical classes. *Id.* at 60:20-25. Frander replied that this "did not allay [her] safety concerns" because clinical classes involve "repetitive activity." Frander Decl. ¶ 12. She was adamant that she "needed an explanation from a physician as to whether [he] could engage in safe lifting on a regular basis" in the clinical class. *Id.* Frander followed up with an email

5

to Yancey the same day they met with him. In that email, she stated that her "goal is to make sure that you and all patients you care for are safe." Frander Dep. Ex. 1, Email from E. Frander to P. Yancey (Oct. 7, 2010), ECF No. 58 at 169. She directed Yancey to submit the lifting capacity letter by 5:00 P.M. on October 12 in order to be able to continue to attend clinical class on October 13. *Id.* Professor Tom Hackett, Interim Provost, agreed with Frander's assessment and stated that "[w]e must be certain he is capable of performing the work required in clinicals before we can sanction participation." Pl.'s Resp. to Defs.' Mot. for Summ. J. Ex. 1, Email from P. Hackett to S. Noviello (Oct. 14, 2010), ECF No. 69-1 at 3.

Yancey scheduled an appointment that same day and met with his physician on October 11, 2010. Yancey Dep. 65:18-66:17. But Yancey missed the October 12, 5:00 P.M. deadline to submit the letter. Lewis emailed Yancey to inform him that he could not attend the clinical class until his physician's letter was received. She requested that he reply to her e-mail so that "we can sit do[w]n together and come up with a plan to help you succeed in this program." Lewis Dep. Ex. 11, Email from S. Lewis to P. Yancey (Oct. 12, 2010), ECF No. 57 at 181. Yancey replied to Lewis, copying Noviello and Frander, stating that he had filed a complaint with the Justice Department and that "until I hear from my advocate through the justice department, I

6

will not be meeting with you or anyone concerning this issue. I[f] you want to meet on other issues, set the agenda and make sure I get a copy before we meet." *Id.*, Email from P. Yancey to S. Lewis (Oct. 12, 2010).

Yancey was absent from his clinical class on October 13, 2010. On October 15, 2010, Noviello wrote Yancey the following email:

> Mr. Yancey, I have been notified by the junior level facility faculty that you have not provided documentation from your physician either releasing you to attend clinical without restriction or allowing you to return to clinical with specific restrictions and a specific time frame for those restrictions. You will not be allowed to attend clinical until this documentation is submitted and verified. Your prompt attention to this matter is necessary to avoid further clinical absences which may result in a clinical failure and subsequent course failure. Please notify me if you have questions.

Yancey Dep. Ex. 9, Email from S. Noviello to P. Yancey (Oct. 15, 2010), ECF No. 56 at 142. Yancey responded:

> Sheri, each time you restrict me from clinical, you are breaking the law. I met with my doctor on Monday and he said that he would provide a letter. I'm not sure where it is, but I am not concerned. There is absolutely no reason why I cannot attend clinical. I am being discriminated against for no reason. I can produce many witnesses that contradict everything. Perhaps you should listen to the truth!
>
> Ask your subordinates how I did at Ropes and at all other functions. That is how I plan on proving my case in Federal Court!
>
> I do not play when it comes to my education! Just make sure you are ready for an investigation, as to the truth!

7

> You should know threatening me will get you [no]where! Good Night and Have a Good Weekend.

*Id.*, Email from P. Yancey to S. Noviello (Oct. 15, 2010).

On October 18, 2010, Noviello and Frander met with Yancey to inform him that he needed to provide the lifting capacity letter that very day. They also admonished him about conduct that they had learned about that they considered to be unprofessional and unacceptable under the school's behavior policy. That conduct included disrespect toward faculty and other medical professionals, including referring to staff at a nursing home during a clinical class as "girls." Yancey Dep. 68:1-7; Noviello Aff. ¶ 14; Frander Decl. ¶ 13. Noviello specifically instructed Yancey not to use the would "girl" to anyone who worked at the nursing home, Yancey Dep. 86:20-88:8, because she was especially concerned with maintaining a good relationship with the nursing home as an off-campus partner, Noviello Aff. ¶¶ 10-12. Yancey replied, "Sheri, I don't care . . . You are violating my constitutional rights, and I'm not going to tolerate it." Yancey Dep. 88:2-4. Noviello drafted a memo summarizing Yancey's unprofessional behavior after the meeting. *See* Pl.'s Resp. Ex. 4, Memorandum from S. Noviello (Oct. 18, 2010), ECF No. 69-1 at 11 (noting that Yancey addressed her by her first name right after she advised him that it was unprofessional to do so).

8

Yancey finally delivered the letter from his physician, Dr. Henderson, that same day.  Yancey Dep. 65:10-13; Frander Decl. ¶ 14.  Dr. Henderson's letter stated that Yancey could "lift 50 pounds routinely and occasionally more . . . and that the duties and activities of a nurse pose no obstacle to him."  Yancey Dep. Ex. 6, Letter from W. Henderson to E. Frander (Oct. 11, 2010), ECF No. 56 at 128.  Yancey was cleared to return to clinical class.  Frander Decl. ¶ 14.  On October 19, 2010, Yancey attended the clinical class at the nursing home, where he greeted a group of females and again referred to them as "girls."  Yancey Dep. 88:10-89:5.

Each nursing student receives a copy of the Student Handbook, containing the school's Behavior Policy and Attendance Policy.  The Behavior Policy "is based upon the fundamental principle of behavior that reflects courtesy and respect for others" and provides that students "are expected to exhibit professional appearance and behavior at all times during school related activities."  Noviello Aff. ¶ 6 & Ex. A, Professional Behavior and Attire Policy 69, ECF No. 54-4 at 8.  Among other requirements, the Behavior Policy expects compliance with the following: "Voice your opinions and ideas in a calm, courteous manner," "When you disagree with others, do so in a firm but tactful and courteous manner," "Demonstrate respect for patients, families, and faculty by addressing them by title and

9

last name (Dr., Mr., Ms., etc.), "Maintain a professional attitude by demonstrating respect and courtesy with patient[s], families, and all members of the health care team." *Id.*

The Attendance Policy allows a student to miss ten percent of classroom classes, but "absences from clinical experiences or campus labs will result in clinical failure." Lewis Decl. Ex. A, Attendance Policy 52-53, ECF No. 54-3 at 5-6. Clinical or campus lab classes can only be made up if a committee grants a student's request for exception, which requires an "extreme extenuating circumstance" such as illness of the student or an immediate family member requiring his/her care, death of a family member, or other unforeseen emergencies. *Id.*

Lewis stated in an email that she did not know why the handbook still says a student would be failed for missing clinical days because she had been operating under the ten percent rule. Lewis Dep. Ex. 15, Email from S. Lewis to G. Jones (Sept. 9, 2010), ECF No. 57 at 186. Lewis explained in her deposition that the policy for clinical hours still is that a student fails until the reviewing team accepts the student's letter for exception based on "extreme extenuating circumstances;" however she agreed that a student could miss two six-hour classes of clinical before reaching the ten percent threshold. Lewis Dep. 73:4-74:21.

Because Yancey missed clinical class October 13, 2010, Lewis instructed Yancey to submit a request for an exception. Lewis Decl. ¶¶ 9-10. Lewis was one of six members of the committee that considered whether to grant an exception and allow a student to make up for the absence. *Id.* ¶ 8. The committee unanimously voted not to allow Yancey an exception because he failed to demonstrate an "extreme extenuating circumstance" beyond his control. *Id.* ¶ 11. Other students granted an exception met this standard by demonstrating personal illness, illness of a child, or a required court hearing. *Id.* ¶ 12. While it is true that Lewis ordered Yancey not to attend class, Lewis Dep. 61:12-20, the committee determined that Yancey's failure to submit the letter from his physician was not an unforeseen circumstance out of Yancey's control, Lewis Decl. ¶ 11. Yancey failed the course due to the absence. *Id.* ¶ 13.

Noviello ultimately decided to dismiss Yancey from the school entirely based on what she considered to be his inappropriate conduct and his failure of the course due to the unexcused absence. Noviello Aff. ¶ 17. Noviello believed the tone and content of Yancey's communications with her were rude, argumentative, abrasive, and in violation of the Behavior Policy. Noviello Aff. ¶ 13. Noviello considered Yancey's use of the term "girl" to be unprofessional, especially after direct instructions not to do so. *Id.* ¶ 15. Noviello also reviewed

reports of his history of rude behavior toward Professor Condrey and during his application to the School.  *Id.* ¶ 16 & Ex. B, Records of Incidents with Yancey Prior to Admission, ECF No. 54-4 at 12-17.  Noviello concluded that Yancey's clinical failure and his behavior policy violations each provided an independent basis to dismiss Yancey from the school.  *Id.* ¶ 19.

On October 21, 2010, Noviello met with Yancey to discuss these problems and informed him that he was being dismissed from the school.  *Id.* ¶ 18.  Yancey was given a letter explaining that he failed NURS 3275 "for failure to comply with the School['s] Behavior Policy," setting forth each violation. Pl.'s Resp. Ex. 3, Memorandum from S. Lewis to P. Yancey (Oct. 21, 2010), ECF No. 69-1 at 10.  Yancey disputes the accuracy of these records by citing to an email written by Frander where she states that "we had to scramble to write Jody's letters because we forgot all the details when we didn't document until the next week."  Frander Dep. Ex. 7, Email from E. Frander to T. Condrey and M. Merriman (Oct. 25, 2010), ECF No. 58 at 184.  Yancey also disputes the authorship of the letter.  While Lewis testified that she does "not remember putting this together," she admits putting her name on it.  Lewis Dep. 122:14-23.  The record shows that Noviello asked Lewis to draft the memo, Noviello Aff. ¶ 17, and Yancey points to an email showing that Lewis sent Noviello the "Yancey Letter of Clinical Failure" as an attachment, Pl.'s

Resp. Ex. 3, Email from S. Lewis to S. Noviello (Oct. 21, 2010), ECF No. 69-1 at 9.

## DISCUSSION

The question before the Court is not whether Yancey should have been dismissed from CSU's School of Nursing. The pending motion presents two specific issues: (1) whether the Board unlawfully discriminated against Yancey because of his disability when school officials required him to produce a letter from his doctor giving an assessment of his ability to lift patients and perform nursing tasks safely in light of his abdominal hernia; and (2) whether Defendants unlawfully retaliated against Yancey after he complained of disability discrimination when they dismissed him from CSU's nursing program. The Court addresses both issues in turn.

**I.   Discrimination Claims against the Board**

The present record supports the conclusion that Defendants required Yancey to obtain a letter from his physician evaluating his lifting capacity because of what they perceived to be his unusual abdominal hernia. Yancey maintains that by prohibiting him from participating in the clinical portion of the course without first supplying the requested letter, Defendants discriminated against him because of his disability. The Board contends that requiring the letter did not violate Section 504 of the Rehabilitation Act or Title II of the ADA because of the

13

need to determine whether Yancey could safely perform the physical labor involved in the clinical class.

In the public services context, a plaintiff claiming discrimination under Section 504 or Title II must generally show that he is a qualified individual with a disability and was excluded from participating in a public entity's program by reason of his disability. *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1081, 1083 (11th Cir. 2007).[1] Moreover, the right to participate is not absolute; reasonable restrictions may be imposed upon participation. *See Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406-07 (1979) (holding that an individual is not "otherwise qualified" to participate unless he "is able to meet all of a program's requirements," including "necessary physical qualifications," with or without reasonable accommodation); *Bircoll*, 480 F.3d at 1081 ("Title II defines a 'qualified individual with a disability' as [one] 'who, with or without reasonable modifications . . . meets the essential eligibility requirements for . . . the participation in programs or activities provided by a public entity.'") (quoting 42 U.S.C. § 12132).[2] As the Board points out, "[n]othing in the language

---

[1] The Board admits that it receives federal financial assistance on behalf of Columbus State University as it pertains to the Rehabilitation Act. Defs.' Resp. to Pl.'s Statement of Material Facts ¶ 48, ECF No. 68-1.

[2] In the employment context, a plaintiff is not a "qualified individual" if he is unable to perform an essential function of the position even with a reasonable accommodation or would otherwise pose

14

or history of § 504 reflects an intention to limit the freedom of an educational institution to require reasonable physical qualifications for admission to a clinical training program." *Davis*, 442 U.S. at 414.

The Board contends that school officials required Yancey to provide the letter because they needed to make an individualized assessment based on objective evidence as to whether Yancey could safely participate in clinical class. When school officials learned of his unusual hernia, they had an objective basis for investigating whether it created a potential threat to the safety of himself or others and whether reasonable accommodations needed to be made to minimize the risk of injuries. Yancey's physical examination form did not fully disclose the nature of his hernia. It was only after observing that his hernia was highly unusual compared to a typical hernia that the school officials became aware of a potential safety issue relating to lifting patients as required in his clinical class. Because of that legitimate concern, the school officials reasonably required the lifting capacity letter from Yancey's physician as a means to gather more information about that

---

a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation. *Pinckney v. Potter*, 186 F. App'x 919, 925 (11th Cir. 2006) (per curiam); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1126 (11th Cir. 1993) ("Performing the essential functions of a job means, among other things, being able to perform those functions without risk of serious physical harm to oneself or others.").

perceived safety risk. Engaging in such investigation does not amount to unlawful discrimination. *See, e.g., Arline v. Sch. Bd. of Nassau Cnty.*, 772 F.2d 759, 764-65 (11th Cir. 1985), *aff'd*, 480 U.S. 273 (1987) (explaining that public entity's determinations as to qualification and accommodation must "reflect a well-informed judgment grounded in careful and open-minded weighing of the risks and alternatives," and not simply consist of "conclusory statements that are being used to justify reflexive reactions grounded in ignorance or capitulation to public prejudice"); *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) (holding in context of ADA's provision on employers and medical exams that "the ADA does not, indeed cannot, require a[n employer] to forgo a fitness for duty examination to wait until a perceived threat becomes real [or] results in injuries"); *cf. Pinckney*, 186 F. App'x at 921, 925 (noting that employer investigated plaintiff's disability to determine whether applicant was qualified by requesting independent medical evaluation).

It is significant to note that Yancey was never denied participation in the program because of his disability. Instead, his participation was simply delayed until he provided more information that would allow school officials to investigate whether he could participate safely in the program. And much of the delay in being able to participate in the

16

program was self-inflicted. As soon as school officials received the letter from his physician, Yancey was cleared to continue attending his clinical course. Had Yancey promptly obtained the letter that he ultimately did produce, he likely would not have missed a single clinical class. The Court finds that under these circumstances, no evidence exists from which a reasonable jury could conclude that the Board unlawfully discriminated against Yancey because of his disability when school officials required him to produce the lifting assessment from his physician. Therefore, the Board is entitled to summary judgment as to Yancey's ADA and Section 504 discrimination claims.

## II. Retaliation Claims against the Board and the Individual Defendants

Yancey does not contend that he was dismissed from the nursing program because of his disability. He maintains that Defendants dismissed him because he complained that they were discriminating against him due to his disability and that Defendants then contrived reasons to justify his dismissal. This contention represents a classic retaliation claim.

The ADA makes it unlawful for any person to retaliate "against any individual because such individual has opposed any act or practice made unlawful" under the ADA. 42 U.S.C. § 12203(a). Generally, ADA retaliation claims are evaluated

under the same framework as retaliation claims under Title VII of the Civil Rights Act of 1964:[3] a plaintiff must first establish a *prima facie* case by showing that (1) he engaged in statutorily protected expression, (2) he suffered an adverse action, and (3) there is a causal link between the protected expression and the adverse action. *Stewart v. Happy Herman's Chesire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). "The failure to satisfy any of these elements is fatal to a claim of retaliation." *Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th Cir. 2004).

Defendants argue that Yancey cannot make out a *prima facie* case of retaliation because he did not engage in statutorily protected expression. While a plaintiff may be able to recover on his retaliation claim even though the practice he opposed "is not actually unlawful," *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008), a plaintiff must show that he "had a good faith, reasonable belief" that the defendant's actions were unlawful, *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (internal quotation marks omitted). "[T]his standard has both a subjective and an objective component." *Id.* at 1312 (internal quotation marks omitted). That is, even if Yancey subjectively believed that he was being

---

[3] This is true even outside the employment context. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180, 1181 & n.31, 1183 & n.34 (11th Cir. 2003).

unlawfully discriminated against because of his disability, his belief must also be "*objectively* reasonable in light of the facts and record presented." *Diamond v. Morris, Manning, & Martin, LLP*, 457 F. App'x 844, 846 (11th Cir. 2012) (per curiam) (internal quotation marks omitted). The objective reasonableness of a plaintiff's mistaken belief is measured against the controlling substantive law at the time he opposed the defendant's actions. *Butler*, 536 F.3d at 1214; *Clover v. Total Sys. Servs. Inc.*, 176 F.3d 1346, 1351-52 (11th Cir. 1999) (noting that the conduct believed to be discriminatory "must be close enough" to unlawful discrimination "to support an objectively reasonable belief that it is [unlawful]").

As previously explained, the law was clear at the time of Yancey's complaints of discrimination that the School of Nursing could lawfully require the lifting capacity letter that the school officials required of him. The objective reasonableness of Yancey's mistaken belief that such lawful conduct amounted to unlawful discrimination must be measured against that existing law. Since Yancey's belief was clearly mistaken, it was not objectively reasonable. *See Butler*, 536 F.3d at 1214 ("Where binding precedent squarely holds that particular conduct is not [unlawful, a plaintiff]'s contrary belief that the practice is unlawful is unreasonable."). This case does not fall within the category of exceptional cases where the belief was mistaken *as a*

19

*matter of law* but reasonable for purposes of a retaliation claim. Quite simply, the school officials here required the letter after becoming aware that the submitted medical form that was required for admission to the program did not disclose the unusual nature of Yancey's hernia, and the law clearly allowed them to do so. Given that clearly established law, it was not objectively reasonable for Yancey to believe that this requirement amounted to unlawful discrimination. Accordingly, Yancey's complaints of discrimination were not protected conduct and cannot form the basis for a retaliation claim under the ADA. Defendants are therefore entitled to summary judgment on that claim.

## CONCLUSION

For the reasons explained above, the Court grants Defendants' Motions for Summary Judgment (ECF Nos. 54 & 63) and denies Yancey's Motion for Partial Summary Judgment (ECF No. 53).

IT IS SO ORDERED, this 11th day of July, 2013.

S/Clay D. Land<br>
CLAY D. LAND<br>
UNITED STATES DISTRICT JUDGE